Gene G. Tessers, Yvonne Y. Tessers v. Commissioner.
Tessers v. Commissioner
Docket No. 2206-65.
United States Tax Court
T.C. Memo 1966-172; 1966 Tax Ct. Memo LEXIS 113; 25 T.C.M. (CCH) 907; T.C.M. (RIA) 66172; July 21, 1966
*113 Edward M. Ross, 300 E. Queen, Inglewood, Calif., for the petitioners. Wesley A. Dierberger, for the respondent. RAUM
Memorandum Findings of Fact and Opinion RAUM, Judge: The Commissioner determined a deficiency in income tax for 1960 against petitioners, husband and wife, in the amount of $18,323.34 plus $9,161.67 as an addition for fraud under Section 6653(b) of the 1954 Code. They filed their 1960 joint return with the district director at Los Angeles. The husband will be referred to as the petitioner. The principal question is whether petitioner is chargeable with the total winnings of $56,000 on an Irish Sweepstakes ticket, as contended by the Commissioner, or whether he is chargeable with only one-fifth of such winnings on the theory that he had sold four one-fifth interests in the ticket to others prior to the race. The parties have filed two stipulations of facts which are incorporated herein by this reference. In 1960 petitioner purchased a ticket on the Irish Sweepstakes for $3.00. The race was held in Ireland on October 26, 1960. About a week or so prior to the race a preliminary drawing was announced in which petitioner's ticket was identified with one *114 of the horses in the race. There were some 40 horses in all. Petitioner's horse was a "long-shot", with odds described variously in the evidence before us as 40 to 1, 50 to 1 and 60 to 1. Petitioner would win $140,000 if his horse came in first, $56,000 if second, and $25,000 if third. If his horse did not place at all among the first three, he would be entitled in any event to a consolation prize of some $1,200. The publication of petitioner's name in the local newspapers resulted in considerable excitement in petitioner's home. He received many phone calls, and was even interviewed on television. He was visited some days before the race by a young man of about 22 years of age named Joseph L. Shalant, who in 1960 was a student and also worked as a salesman of mutual fund shares. He had not previously known petitioner, and his visit was prompted by the newspaper accounts about petitioner's ticket. As a result of Shalant's visit a plan was evolved whereby petitioner would sell or purport to sell interests in his ticket to four relatives, and a short agreement dated October 24, 1960 was written in long hand by Shalant whereby petitioner agreed - that if I sell shares in my ticket *115 * * * to my relatives (totalling approx. 4 families) so that we all (5 families approx.) share equally in winnings of ticket I will pay Joseph L. Shalant the following fees for professional advice: Winnings
Fee
$140,000
$5,000
56,000
2,000
28,000
1,000
A meeting of relatives was had at petitioner's home the following evening, October 25, 1960, at which Shalant and another person, Robert Austin (an insurance salesman), were also present. Petitioner and his wife were immigrants from Holland, having come to the United States only about two years prior thereto. His relatives - four sets of spouses - were also recent immigrants from Holland, two of them having arrived in this country only in 1960. None of them was proficient in the use of the English language. All, including petitioner, were persons of very modest means. At the meeting on the evening of October 25, 1960, Shalant prepared documents whereby petitioner purported to sell and each of the four husband relatives purported to purchase a one-fifth interest in the sweepstake ticket for $350 each. It does not appear that any one of the four purchasers had $350 with which to make any such purchase, nor was *116 any purchase price in fact paid, except as hereinafter set forth. There was credible testimony before us from which we can and do hereby find that there was an understanding between petitioner and each of the other four that if petitioner's horse won the race each of the four would receive $1,000, if the horse came in second each would receive $750, and if the horse came in third each would receive $500. The race was in fact held on October 26, 1960, as scheduled, and petitioner's horse finished second, thus entitling the holder of the ticket to receive $56,000. On that day, but after the results of the race were known, petitioner, Shalant, and the four purchasers went to a bank at which the wife (Mrs. Jacobs) of one of the four worked as a bookkeeper and had a checking account. Shalant had borrowed $350 in cash from his mother, and made it available to Mrs. Jacobs who deposited it in her account. She then drew a check upon that account payable to petitioner, purportedly in payment of one of the purchases of a one-fifth interest in the ticket. Petitioner endorsed the check, and the proceeds were immediately redeposited in Mrs. Jacob's account. The process was repeated three more *117 times, so that there appeared to be four checks in all, each in the amount of $350 payable to petitioner in payment for the respective four one-fifth interests in the ticket. When the fourth check was cashed, Shalant took the proceeds and returned the $350 to his mother. At some time thereafter in 1960 not specifically fixed in the record, an amount of $56,000 was paid on the ticket. Petitioner collected $55,956.85 thereof from the Bank of America in Los Angeles on December 22, 1960. On that date he purchased a cashier's check in the amount of $50,000, and received $5,956.85 in cash. On December 29, 1960, petitioner and his wife made a deposit of $12,500 in a newly opened bank account. On that day he also purchased cashier's checks in the amounts of $20,000 and $5,000 which were used respectively for (1) the purchase of mutual fund shares and (2) a contribution to the Grace Episcopal Church. The mutual fund shares were purchased in the names of petitioner and his wife as well as in the names of the other four couples. However, it does not appear that any of those other four couples had any benefit from such shares, and that whenever petitioner desired to "cash in" any of the shares, *118 the couples would sign the necessary papers to enable petitioner to obtain the proceeds for his own use. At some time on or prior to January 10, 1961, Shalant had made computations as to the amount of income tax payable by each of the couples as a consequence of attributing to each a share of the winnings of the ticket. On January 10, 1961, petitioner obtained cashier's checks in such amounts, being $2,564 for himself and his wife, and $2,188, $2,594, $1,751, and $1,754, respectively, for the other couples, all of which were in fact used in payment of the income taxes shown on the returns for each. Shalant arranged for the preparation of the returns by a Mr. Van Oppen. A final cashier's check in the amount of $1,649 was obtained by petitioner for himself and his wife on January 10, 1961, the purpose of which was not disclosed. Each of the four couples in fact received $750 for their participation in these transactions. They received no other benefits therefrom (apart from the checks given to them to pay their taxes). Two of the couples received sums of money from petitioner from time to time to assist them in meeting living and other expenses, but such sums do not appear in any *119 way to have been related to their alleged shares in the proceeds of the winning ticket. We have not set forth above all of the evidence before us, but upon the basis of the entire record we cannot conclude that petitioner made bona fide sales of four one-fifth interests in his ticket. In substance, he merely paid each purported purchaser $750 for participating in the transaction so as to give the appearance of a sale. We hold that there were in fact no such sales, and that petitioner is accountable for the full amount of the winnings on his ticket. On the other hand, we do not approve the determination of fraud. Petitioner had been in the United States only two years at the time of the race. His English was poor, and he understood very little of the details of what Shalant was arranging on his behalf. He was a witness before us, and we believe his testimony that he thought that Shalant was arranging matters in a "legal" way. We do not believe that he had any intention to defraud the Treasury. Bearing in mind that the burden is upon the Government to establish fraud by clear and convincing evidence, we cannot find fraud here. Decision will be entered for respondent in the amount *120 of the basic deficiency.